477 P.2d 332

John WREYFORD, Plaintiff-Appellant, Aetna Insurance Company, Plaintiff-Appellant in Intervention,

v.

Glen R. ARNOLD, Defendant-Appellee.

No. 448.

Court of Appeals of New Mexico.

Sept. 11, 1970.

Rehearing Denied Oct. 29, 1970.

Palmer & Frost, Farmington, for appellant Wreyford.

John R. Cooney, Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, for appellant Aetna Insurance Co.

Richard L. Gerding, Tansey, Rosebrough, Roberts & Gerding, Farmington, for appellee.

## OPINION

OMAN, Judge.

This cause arises out of a collision of motor boats being operated for pleasure on Navajo Lake or Reservoir on July 3, 1967.

Although plaintiff and plaintiff in intervention rely upon two points for reversal, both points relate to the single question of whether Navajo Lake is part of the navigable waters of the United States. We hold it is, and that the trial court erred in finding and concluding otherwise. Thus, we decide only the first point, and briefly consider the question of damages, since the case must be remanded to the trial court for the purpose of awarding damages to plaintiff and plaintiff in intervention.

Plaintiff was the owner and operator of one of the boats at the time of the collision. The plaintiff in intervention was his insurer and intervened to recover the amounts it paid to plaintiff for damages to his boat and his medical expenses. Defendant was the owner and operator of the other boat at the time of the collision.

The trial court found and concluded that the collision occurred as the proximate result of the negligence of both plaintiff and defendant. Neither this finding nor this conclusion is challenged, and plaintiff and plaintiff in intervention concede they are barred from recovery by plaintiff's contributory negligence, if the New Mexico law of negligence is applicable.

It is agreed that if Navajo Lake is a part of the navigable waters of the United States, then maritime law is applicable and damages are recoverable thereunder by plaintiff and plaintiff in intervention. Authority for the applicability of maritime law to navigable waters of the United States is found in Art. III, § 2 of the Constitution of the United States, wherein it is provided: "The judicial Power shall extend to all Cases * * * of admiralty and maritime Jurisdiction; * * * *"

The applicability of maritime law to claims arising on navigable waters of the United States is discussed in Intagliata v. Shipowners & Merchants Towboat Co., 26 Cal.2d 365, 159 P.2d 1 (1945), wherein it is stated:

"Plaintiff's claim arises from a collision on navigable waters of the United States and thus involves a maritime cause of action [authority omitted], which in a federal court sitting as a court of admiralty would be determined under federal maritime law. [authorities omitted] The federal maritime law provides for equal division of damages, if both parties were at fault, even though there was a disparity in fault. [authorities omitted] Jurisdiction of the state court to try the action is based on section 24(3) of the

**158**

Judicial Code, 28 U.S.C.A. § 41(3), which in 'all civil causes of admiralty and maritime jurisdiction' saves to suitors 'the right of a common-law remedy where the common law is competent to give it.' The remedy afforded in the state court may be invoked to secure such rights 'as readily admit of assertion and enforcement in actions in personam according to the course of the common law.' [authorities omitted] Plaintiff's action is in personam to recover damages for tort and is 'one of the most familiar of the common-law remedies.' [authority omitted] 'That there always has been a remedy at common law for damages by collision at sea cannot be denied.' [authority omitted] Since contributory negligence generally precludes a plaintiff from recovering damages at common law, defendant contends that the doctrine of contributory negligence is part of the common-law remedy and is therefore binding on a state court in a maritime cause as a limitation of the court's jurisdiction.

"* * *.

"It is now settled that 'The general rules of the maritime law apply whether the proceeding be instituted in an admiralty or common law court,' [authorities omitted] and that the state courts must preserve all substantial admiralty rights of the litigants. [authorities omitted] A state court having the same jurisdiction over a case that a federal court would have if the suit had been brought there, must determine the rights of the parties under the maritime law as a 'system of law coextensive with, and operating uniformly in, the whole country.' [authorities omitted] State law is inapplicable to a maritime cause 'if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations.' [authorities omitted] * * * 'Any rule of assumption of risk in ad-

miralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages.' [authorities omitted] Any doubt as to whether the foregoing cases or Belden v. Chase governs maritime causes in the state courts is dispelled by the Supreme Court's declaration in Garrett v. Moore-McCormack Co., supra, 317 U.S. [239] pages 244, 245, 63 S.Ct. [246] at page 250, 87 L.Ed. 239, that: 'In many other cases this Court has declared the necessary dominance of admiralty principles in actions in vindication of rights arising from admiralty law, Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218, an 1893 decision which respondent relies upon as establishing a contrary rule, has never been thus considered in any of the later cases cited.' "* * *.

"There can be no doubt that the division-of-damages rule in maritime collision cases involving the fault of both parties is as binding on the state courts as the federal rule as to burden of proof with respect to the validity of releases in suits by seamen for maintenance and cure. The right of a plaintiff to a division of damages in a maritime collision case involving the fault of both parties is a substantial right deeply rooted in admiralty, inherent in his cause of action, and such a part of the substance of his claim that it 'cannot be considered a mere incident of a form of procedure.' It is indeed an essential characteristic feature of the substantive law of admiralty. The very basis of the plaintiff's cause of action, which is unquestionably a maritime cause of action, would be destroyed if recovery were denied because of his contributory negligence, for it is only under admiralty law that he has any claim for damages arising from a maritime collision caused by the fault of both parties. If the state court should apply state law rather than admiralty law 'the remedy

afforded by the state would not enforce, but would actually deny, federal rights which Congress, by providing alternative remedies, intended to make not less, but more secure.' [authorities omitted] That the United States Supreme Court regards the plaintiff's right in such a case as a substantial admiralty right clearly appears not only from its abandonment of Belden v. Chase, but from its references in the Garrett case to state doctrines of contributory negligence and assumption of risk as doctrines that must give way to admiralty principles in actions at law on maritime torts.  * * *

" * * *.

"Federal law governs not only the consequences of the fault of the parties but the question whether their vessels were operated in compliance with the rules governing navigation on navigable waters of the United States. The Federal Inland Rules of Navigation, 30 Stats. 96–102, 33 U.S.C.A. §§ 171–231, are controlling except as they permit the application of special local law.  * * *"

See also, generally, as to what are navigable waters of the United States and the measure of recoverable damages under maritime law for damages and injuries sustained thereon, Guinn, An Analysis of Navigable Waters of the United States, 18 Baylor Law Review 559 (1966); Sanders, Admiralty in the Ozarks, 23 Ark.Law Review 96 (1969), (Reprinted in 33 ATL L.J. (1970)).

■ The question of navigability is one of fact. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); United States v. Utah, 283 U.S. 64, 51 S. Ct. 438, 75 L.Ed. 844 (1931); The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870); United States v. Rio Grande Dam & Irr. Co., 9 N.M. 292, 51 P. 674 (1898). However, it is a fact of which a court may take judicial notice, at least insofar as the waters are within its jurisdiction. Arizona v. California, supra; United States v. Dam & Irr. Co., supra.

The evidence adduced at the trial relating to the question of navigability is undisputed. The trial court found:

"On the date of the accident, Navajo Lake was a body of water lying within two states, New Mexico and Colorado, and capable of being traveled upon by small boats between the two states."

This finding is not attacked and is unquestionably supported by the evidence. The evidence as to the size of the boats which travel upon this Lake was that they range in size from small ski boats to house boats 52 feet in length, and there was testimony that "any boat you can put in the water" can be operated on the Lake between New Mexico and Colorado.

■ The collision in question was investigated by the United States Coast Guard, consistent with its duties relative to waters subject to the jurisdiction of the United States. 33 C.F.R. § 2.05–1 (Rev. as of January 1, 1970). Waters subject to the jurisdiction of the United States, for the purpose of enforcement of regulations administered by the Coast Guard, means the navigable waters of the United States, 33 C.F.R. § 2.10–10, supra. Navajo Reservoir has been determined by the Commandant, United States Coast Guard, to be a part of the navigable waters of the United States. 33 C.F.R. §§ 2.26–1 and 2.53–1, supra. This determination is expressed in 34 F.R. 2203, February 14, 1969, as follows:

"A determination has been made that the Navajo Reservoir crosses the border between Colorado and New Mexico and is part of the navigable waters of the United States because it permits navigation or travel between two States, and this interpretation is in 33 CFR 2.26–1 and 2.53–1. The main body of the reservoir extends 35 miles within New Mexico along the San Juan River. After crossing the Colorado-New Mexico State line, the reservoir extends about 7 miles into Colorado."

■ Although this determination by the Commandant, United States Coast Guard, is not conclusive of the issue of navigabili-

ty, it is relevant evidence thereon. See Lutesville Sand & Gravel Co. v. McLaughlin, 181 Ark. 574, 26 S.W.2d 892 (1930). As already stated, we agree with this determination, and disagree with the finding and conclusion of the trial court that:

> "Navajo Lake is not used nor susceptible of use as a body of water in its ordinary condition over which trade and travel may be conducted in the customary modes of trade and travel on water."

And, therefore, is "not navigable waters of the United States."

■ In *The Daniel Ball, supra,* the Supreme Court announced the following test:

> "* * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

■ Navigable waters of the United States may include artificial [or man-made] waterways, as well as those which are natural. Ex Parte Boyer, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1883).

■ The capability or susceptibility for use by the public as a highway for trade and travel is the true criterion by which to determine the navigability of waters. Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); The Montello, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874); *The Dan-*

*iel Ball, supra;* Madole v. Johnson, 241 F. Supp. 379 (W.D.La.1965). This criterion is applicable if the capability can be accomplished by making reasonable improvements. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L. Ed. 243 (1940); Economy Light & Power Co. v. United States, supra; Pennsylvania Water & P. Co. v. Federal Power Com'n., 74 App.D.C. 351, 123 F.2d 155 (1941).

The type of craft used in accomplishing trade and travel over the waters is of no particular significance. Arizona v. California supra; *The Montello, supra;* The Lucky Lindy, 76 F.2d 561 (5th Cir. 1935); Hahn v. Ross Island Sand & Gravel Co., 214 Or. 1, 320 P.2d 668 (1958), rev'd. on other grounds. 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1958).

■ Applying the capability, or susceptibility, test to the waters of Navajo Lake on the date of the accident, we are of the opinion that these waters were navigable waters of the United States, and that the trial court should have awarded plaintiff and plaintiff in intervention damages consistent with the rules applicable in maritime collision cases.

The judgment is reversed and the cause remanded to the trial court for the purposes of determining and awarding plaintiff and plaintiff in intervention the damages to which they are entitled.

It is so ordered.

HENDLEY, J., concurs.

SPIESS, C. J., dissents.

SPIESS, Chief Judge (dissenting).

The reversal directed by the majority has as its basis a determination that Navajo Lake constitutes navigable waters of the United States and consequently that the rights of the litigants in this action are to be determined by maritime law. This conclusion is based upon a finding of fact made here by the majority. The trial court refused a proposed finding that in effect would declare that the lake constituted

navigable waters of the United States, and made a contrary finding. In my opinion the judgment of the trial court should be affirmed. It is horn-book law that an appellate court should give effect to findings of fact by the trial court which have substantial support in the evidence.

It is fundamental that navigability is a fact question. Those waters which are navigable in fact are navigable in law. United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931); The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870).

The burden of proof rests upon the party asserting navigability. The test frequently applied by the Supreme Court of the United States and quoted by the majority is stated in *The Daniel Ball*, supra.

" * * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

*The Daniel Ball*, although involving a river, has been considered applicable in principle to other bodies of water, including inland lakes. See Marine Office of America v. Manion, D.C., 241 F.Supp. 621 (1965).

In the trial court, appellants sought to prove that Navajo Lake constitutes navigable waters of the United States and requested findings to that effect. Clearly, to meet the established tests, appellants were required to prove that the lake in its *ordinary condition* forms a continued highway over which commerce is, or may be, carried on between the states of Colorado and New Mexico. To my mind there is no question that the evidence upon this issue was conflicting, and, as disclosed by the record, the trial court resolved the issue by finding:

"4. Navajo Lake is not used or susceptible of use as a body of water in its ordinary condition over which trade and travel may be conducted in the customary modes of trade and travel on water."

I believe that it is important to set forth the testimony which was presented to the trial court in order to demonstrate the conflict in such testimony upon the material issue and, further, to show that the trial court's finding against navigability has substantial support.

The only testimony related to traveling by boat upon the lake from New Mexico to Colorado consisted of that given by the plaintiff-appellant, Wreyford, and witnesses presented by him. Wreyford testified:

"Q I think you stated that prior to the date of the accident, you had boated on Navajo Lake, is that correct?

A Yes.

Q Had you gone into Colorado?

A Yes, I had been into Colorado earlier that year.

Q Do you know any particular location, or what county you were in in Colorado?

A Well, we went up the San Juan River and crossed into the State of Colorado where the old fenceline and state line is, and also the summer prior to that we had been up into Colorado water skiing on a small ski boat.

Q On this—the first trip that you mentioned, what boat were you operating at that time?

A The large houseboat that I have.

Q Describe the dimensions of that boat for the court?

A It's a fifty-two foot houseboat, twelve foot wide.

· Q Were you able to navigate · this without difficulty on the confines of the lake within Colorado?

A Yes. ·

Q Do you know how far you went into Colorado?

A Oh, I would say probable three to four miles, something like that.

Q Do you know if there were any docking facilities available?

A There's a ramp there. They do not have a marina. You can—at Arboles, you can buy gas, and in about any quantity you want, but they do not have their pumping facilities down to the lake, it has to be brought down in cans.

Q And any boats docked or stationed in Colorado travel to New Mexico, particularly to the marina at Navajo Dam?

A Yes, I have seen boats out there from up there, but to be able to identify a specific one, no sir, I couldn't.

Q How were you able to establish that they were boats from Colorado?

A Well, on one occasion, I had talked with an individual that had come down from Colorado.

Q Is there any special marking that Colorado boats have in the way of number of licencing [sic] or what not that you know of?

A Yes, they have a different numbering system, but I couldn't tell you exactly what it is. It's basically the same type of numbering.

Q Have you ever purchased any gasoline or any supplies while traveling from New Mexico to Colorado?

A Not myself, no sir."

One witness, Arnold, testified that he had boated upon the lake for several years. Upon · being asked whether he had ever traveled to Colorado on the lake he answered: "Yes, sir, several times." He testified that he had traveled to Colorado on various types of boats at different times of the year.

Another witness,· John Agee, testified that he had traveled by boat upon the lake into Colorado. · Upon being asked how often he traveled into Colorado he said, "Oh, I have been going out there for several years, but I would say maybe once or twice a year at the most I was in Colorado."

Each of these witnesses testified that he had traveled by boat from New Mexico into Colorada upon the lake at different times. None of them, however, testified that the lake in its ordinary condition would support travel between the states, nor did he give any testimony from which such inference could properly be drawn by the court.

A Richard Dempsey, likewise called by the plaintiff, gave the following testimony:

"Q Mr. Dempsey, do you know, as a matter of fact, that Navajo Lake extends into the State of Colorado?

A Yes, it does.

Q Do you know that it is possible to navigate a vessel or a water craft from New Mexico into the State of Colorado on Navajo Lake?

A During high water, yes.

Q All right; have you observed boats from Colorado coming into the State of New Mexico?

A Yes, I have."

From this testimony the trial court could have inferred that the lake would not support travel between the states in its ordinary condition, but would support such travel during periods of high water.

A witness, Stanley Wells, testified that he had been boating on Navajo Lake since 1963 and further gave the following testimony:

"Q How often have you traveled into Colorado?

A Oh, we'd go anywhere from two or three to a dozen times a year.

Q During 1967, do you know what the water level was on Lake Navajo?

A I don't know the elevation. It was about it's highest point that it had been since its been there.

Q  At any time since you have been boating on Lake Navajo, or what was formerly Lake Navajo, is there any time that you couldn't take a boat into Colorado?

A  There was one time, it went into Colorado for a short period of time and the lake was dropped, and I believe that was in either 1964 or 1965, I am not sure.

Q  But has the water level always since that time extended into Colorado?

A  Yes, sir.

Q  What was the water level in 1967, on July 3rd of that year?

A  Well, it was at the highest—if I recall right, it was the highest point that it had ever been in its history.

Q  During some periods of the month—of the year, does the water level on the lake go down?

A  Yes, it does. I think, in fact, it was just recently going up, I think it's coming back up now.

Q  And even in the low periods, are you able to take a boat and go into Colorado?

A  Oh, yes."

From the Wells testimony the court could have found that the lake in its ordinary condition would support travel between the states of New Mexico and Colorado. The trial court, however, accepted the testimony given by Richard Dempsey, rejected Wells' testimony, and made Finding No. 4, which we have quoted.

The majority say that the evidence adduced at the trial relating to the question of navigability is undisputed. They quote the trial court's Finding No. 3 as follows:

"On the date of the accident, Navajo Lake was a body of water lying within two states, New Mexico and Colorado, and capable of being traveled upon by small boats between the two states."

This finding appears to be limited to the date of the accident.

Navigability involves the ordinary condition of the lake, and not its condition on a single day. This finding does not purport to be a determination that the lake in its *ordinary condition* will support commerce between New Mexico and Colorado, and does not support the theory advanced by appellants. The majority likewise say that Navajo Reservoir has been determined by the Commandant, United States Coast Guard, to be a part of navigable waters of the United States. The opinion of the Commandant was not submitted to the trial court, nor did it appear in this case until the filing of appellant's reply brief.

The majority say of the determination of the Commandant, "Although [it] is not conclusive of the issue of navigability, it is relevant evidence thereon." They then adopt the determination of the Commandant and reject the finding of the trial court. A novel appellate procedure has resulted. The Court of Appeals not only has become the fact finder, but also accepts evidence which was not submitted during the trial, and of which counsel were not accorded the right to question. Upon this evidence it determines the rights of the parties.

This holding of the majority that Navajo Lake is part of the navigable waters of the United States might well have far-reaching effect in that admiralty jurisdiction would be imposed not only upon actions sounding in tort but upon many types of contractual obligations, upon liens, various types of services, crimes committed upon vessels and the waters of the lake, and workmen's compensation matters involving employment at or in connection with boating upon the lake.

I, accordingly, register my dissent.